WILLIAM H. GARVEY, Appellee, v. BOODY-HOLLAND & NEW, Appellant.

**MASTER AND SERVANT:   Place of Work—Servant's Assumption 1 of Safety—Negligence.**   A servant may assume to be reasonably safe a place of work erected or prepared under the sole super-vision of the master, and without participation by the servant. And if the place is not reasonably safe, and the master, as an ordi-narily prudent person, ought to have so known, then he is negligent in requiring the servant to make use of such place.   So *held* in the erection and use of a scaffold.

PRINCIPLE APPLIED:   To paint a 21-foot store ceiling, the master, *under the sole supervision of its manager,* fastened brackets to an interior pillar, and thereon was laid one end of a 2x12x24-foot plank, the other end resting on the top of a show window 19 feet to the south.   The ends of the plank, therefore, extended some-what beyond the end supports.   The plank sagged.   For a middle support, one end of a 2x4x15 was set upon the floor, with the upper end under the middle of the plank.   Neither end of the plank was nailed, it being moved along as the work progressed.   Short, 2-inch material was nailed to the under side *of the plank* and around the

end of the 2x4 support, thus forming a pocket in which the end rested; but otherwise the end of the support was not fastened. The jury might have found that the support was not toe-nailed to the floor. A workman, weighing 160 pounds, stood nearer to the bracket than to the end of the 2x4 support. Plaintiff stood half way between the end of the 2x4 support and the show window. This 2x4 support was *three quarters of an inch too long*, thereby pivoting the plank in the middle—causing it to "bow up." When plaintiff reached up with his brush, the south end of the plank swung to the west, and plaintiff fell and was injured. *Held*, record sufficient to carry the question of the master's negligence to the jury.

**TRIAL: Instructions—Form, Requisites and Sufficiency—Assumption 2 of Fact.** Instructions reviewed, and held not *to assume* that the scaffold in question was defectively constructed.

**TRIAL: Instructions—Applicability to Evidence—Unsupported 3, 5 Theory.** A theory unsupported by any evidence should not be presented to the jury.

**APPEAL AND ERROR: Harmless Error—Instructions—Submission 4 of Matters Not in Issue.** The submission of matters not in issue is not necessarily prejudicial error. So held in the submission of the issue of negligence in both the "construction" and "maintenance" of a scaffold, the former only being in issue, but the evidence on construction and maintenance being identical.

**TRIAL: Instructions—Applicability to Evidence—Unsupported 3, 5 Theory.**

**TRIAL: Instructions—Construction as a Whole—Proximate Cause. 6** Even though in a particular instruction it would have been eminently proper for the court to have given the ordinary rules bearing on proximate cause, yet the charge is sufficient if, in other portions thereof, the subject of proximate cause is fully covered.

**DAMAGES: Future Pain and Suffering—Evidence—Life Tables.** Any **7** fair evidence showing the continuance or permanency of injuries justifies the submission of the issue and the receipt of life tables as bearing thereon.

**EVIDENCE: Opinion Evidence—Relative Credibility of Conflicting 8 Experts.** It is not for the court to pass upon the relative credibility of conflicting experts apparently having the same means of information.

**APPEAL AND ERROR: Review—Questions of Fact—"Most Favorable 9 able View" Rule.** On the question of sustaining the amount of the verdict returned, the appellate court will treat as true the evidence most favorable to appellee.

*Appeal from Polk District Court.*—HUGH BRENNAN, Judge.

SATURDAY, JANUARY 22, 1916.

REHEARING DENIED FRIDAY, MAY 12, 1916.

ACTION for damages resulting in judgment against defendant, from which it appeals.—*Affirmed.*

*Miller & Wallingford* and *Oliver H. Miller,* for appellant.

*Thos. A. Cheshire,* for appellee.

LADD, J.—The defendant is a corporation, and its business, among other things, that of painting and decorating ceilings. It was employed to paint the ceiling of the first floor of the building occupied by Younker Bros.

1. MASTER AND SERVANT : place of work : servant's assumption of safety : negligence.

This was undertaken under direct supervision of its president and manager. As the ceiling was high, a scaffold on which the employes might stand while painting was necessary. A bracket about each pillar was made, with support extending to the floor, and timbers four inches square were then laid on these brackets. One end of a plank 2 inches thick by 12 inches wide by 24 feet long was placed on this timber, and the other end rested on the roof of the display windows at the south of the room. A 2 inch by 4 inch upright about 15 feet long was placed with one end in the middle of the plank and the other resting on the floor. At the upper end, four pieces of board or plank were nailed to the plank and about the end of the 2x4 upright, extending down about two inches. From the pillars and the roof of the show window, the distance was 18 or 19 feet, so that the ends of the plank extended over a little, and the tendency of the plank was to sag. It was about 6 or 7 feet below the ceiling. The painters stood on this plank and, after painting a strip of ceiling 4 feet wide, moved the plank over and painted another space. The plank was not nailed to the upright, and the evidence is in conflict as to

whether the upright was toe-nailed to the floor. One Logan began painting from this scaffolding in the evening of February 10, 1913, and shortly thereafter, plaintiff, Garvey, was directed by the manager to do likewise. He began by painting the ceiling over the display window, but was ordered to omit that until later and to paint out farther. Logan worked between the upright and the pillars, and plaintiff, over towards window roof. At the time in question, Logan, who weighed about 160 pounds, stood 2 or 3 feet from the timber supporting the plank and 7 or 8 feet from the end of the upright, and plaintiff, about halfway between the end of the upright 2x4 and the roof of the display windows, or about 4½ feet from each, when the latter lost his balance and fell to the floor, suffering injuries of which he complains. The petition alleged that this was in consequence of defendant's negligence, as follows:

"1. The defendant did not exercise ordinary care to furnish the plaintiff with a reasonably safe place in which to do his work, in that its president and general manager ordered the plaintiff to work upon the scaffold, knowing it to be dangerous and defectively constructed.

"2. That the scaffold, which was erected under the personal direction of the president and general manager of the defendant company, was an unsafe place for plaintiff to work, and was negligently constructed, in that the support for the board on which the plaintiff was required to stand was not made secure, in that it became displaced when the board was slightly bowed up in the middle.

"3. The defendant was negligent in that it did not cause the board on which the plaintiff was standing to be securely nailed to the upright 2x4, so that the 2x4 upright would not fall, or become displaced.

"4. That it placed the support under the scaffold at such a length that it caused the scaffold to bow up in the center and to be pivoted on the top of said support, the ends thereof

being lower than the center, which caused the scaffold to become unsteady and dangerous to the plaintiff, who was required to work thereon.''

Fifty-five errors are assigned, but as these are condensed into seven brief points, no harm has been done.

I. It is first contended that the evidence was not sufficient to carry any of the several grounds of negligence to the jury and that these, in any event, are contradictory. The latter point is not well taken, as a comparison of the several grounds of negligence will readily demonstrate. Nor do we find the evidence insufficient to carry the several issues to the jury. The plank was not fastened at the ends nor to the upright 2x4 except by the bracket about it, and whether the upright was toe-nailed to the floor or fell to the floor when plaintiff did was in dispute. The evidence was such that the jury might have found either way. The plaintiff testified:

''Just before I fell I straightened up with a brush full of paint as the scaffold became unsteady and caused me to fall to the floor.. . . . The plank became unsteady as though it was teetering, and just as I was about to start to paint on the ceiling it overbalanced, and my hands were up because they could not be down if I was working, and I was not expecting it to be overbalanced and I fell.''

He also testified that defendant's manager had one of his employes saw three fourths of an inch from the upright after it fell. One Killebrew, who was watching for Younker Bros., was sitting within 30 feet of plaintiff when he fell, and thus describes the occurrence:

''This 2x4, as I saw it, looked as though it swung around, and the south end of the plank swung around west about four feet. Mr. Garvey had his hand up painting the ceiling when it swung and he dropped over that way.''

On cross-examination:

''It looked to me as though this thing pivoted on the center piece and swung around.''

Pflanz, a watchman for Younker Bros., testified:

"I think the support under the board or platform was laying down on the floor or laying down partially in some way. . . . Soon after this man fell, a small portion of the support that was under that board was sawed off, and it was put back again."

Bowman was painting the ceiling above the aisle to the north of plaintiff, and saw him as he fell.

"He was standing on the platform or plank facing the south and I was standing facing the south on the north end where I could look right across and see. I saw the board slip to the west just before he fell, and Garvey fell. He was in the act of putting some paint on the ceiling and fell to the southeast on the floor. I came down off my stage at that time. The upright piece under the plank on which Garvey stood before he fell, fell to the floor."

It is unnecessary to refer to the evidence adduced on the other side, if this is enough to merely raise conflict in the evidence. From this testimony the jury might have found that standing as the employes did might have caused the plank to sag on each side of the upright 2x4, and therefore pivot on its end. If so, it necessarily bowed up in the middle and, if not securely fastened, would be likely to move either to the east or west; and as Logan's weight near the north end of the plank kept it in place, the south end was the one witnesses say moved. Had the plank been securely nailed to the upright and it toe-nailed to the floor, this would certainly have had a tendency to steady both, and might have been found by the jury to have been essential to the safety of the scaffolding. In such event, the motion of the plank could have been slight only, and not probably sufficient to render the place to work dangerous. The scaffolding was erected under the direct supervision of defendant's manager, without participation therein by plaintiff, and he had a right to assume that it was reasonably safe from which to do the work assigned him. If

it was not a reasonably safe place to work, and, as seen, the jury might so have found, and the manager so knew, or as an ordinarily prudent man should have known, the defendant was negligent in requiring him to make use of such scaffolding in painting. As everything was done under the supervision of the manager, whether he knew or should have known was for the jury. Some of the evidence tended to show that he and another debated whether to shorten the upright, and there was other evidence that, after plaintiff's fall, it was shortened. A test was made by one man walking over the plank when up, but not with one on each side of the end of the upright. In view of the height of the scaffold and its nature, and the circumstance that it was constructed under the supervision of the manager, we are inclined to agree with the trial court that whether defective, and whether said manager knew or should have known it was defective, was for the jury to say. The evidence was sufficient to carry the several issues to the jury.

II. The ninth instruction is criticised. It reads:

"IX. No complaint is made by the plaintiff as to the width of the plank upon which he was ordered and directed to work, the complaint being confined, as heretofore instructed, to the manner in which the scaffold was constructed, and which he complains caused the injury. If you find from the evidence that the plaintiff's injury and fall from the scaffold was not caused by the defective construction thereof, then plaintiff cannot recover in this case, he having assumed the ordinary risks incident to the business in which he was engaged to work."

2. TRIAL: instructions: form, requisites and sufficiency: assumption of fact.

This is said to assume that the scaffold was defective. Nothing therein is subject to such a construction. Again, it is said, and rightly so, that the jury were not told therein what "ordinary risks incident to the business" were. How this rendered the instruction erroneous was not explained. It may as well be said here, however, that a defective scaffold

furnished by the employer (not constructed by the employe injured) is not one of these, as the instruction plainly indicated.

It is said that the court should have told the jury that one of these risks was the negligence of a fellow servant, and that, if plaintiff's fall was caused by some motion of the plank resulting from some negligent action of himself or one of the fellow servants, the defendant would not be liable. But whether due to negligence of plaintiff was submitted to the jury, and there was no evidence of negligence on the part of Logan or other employe complained of. Moreover, in the above and other instructions, the jury was told that, unless the scaffold was defective in construction, there could be no recovery, and that, to warrant a recovery in any event, the fall must be found the proximate result of the negligence alleged. There was no occasion to caution the jury that plaintiff was charged with knowledge of the nature of, or that he was held to have assumed the ordinary risks incident to, the business; for, as seen, the instructions were so drawn as to exclude deciding otherwise as to the latter, and nothing in the case called for the former.

3. TRIAL: instructions: applicability to evidence: unsupported theory.

III.   The 7th instruction is criticised in several particulars:

"VII.   It was the duty of the defendant company to provide the plaintiff a reasonably safe place to perform the work and services which he was required to perform in the employment in which he was engaged and directed to work  In order to accomplish and meet this obligation and duty, defendant was required to use and exercise reasonable care and diligence in constructing the scaffold upon which the plaintiff was ordered to work, in a reasonably safe condition for the use of such employes, and to keep the same free from danger which, by the exercise of ordinary care and prudence on its part could be avoided, eliminated or removed.  If you find by a preponderance of the evidence that the defendant failed to

perform this duty, then you will be justified in finding that the defendant was guilty of negligence, and your verdict in that case will be for the plaintiff, unless you find that the plaintiff himself was guilty of negligence contributing to his injury. But, on the other hand, if you find from the evidence that the defendant did all that a reasonably prudent and careful person would do under the circumstances and conditions in constructing said scaffold, to guard and protect the safety of the plaintiff in the performance of the work which he was directed to do, then the defendant would not be negligent in this particular and in that case your verdict will be for the defendant.''

The first objection to this is that it submitted to the jury whether defendant had maintained the scaffold in a reasonably safe condition, and, although that issue was not presented, allowed the jury to find defendant negligent on failure to do so. The instruction is inaccurate in this respect, but the scaffold was maintained precisely as constructed and, if unsafely constructed, it was unsafely maintained, and *vice versa*. The jury, then, in order to have found it was maintained in an unsafe condition, must have concluded that it was not of reasonably safe construction, and there was no prejudice.

4. APPEAL AND ERROR: harmless error: instructions: submission of matters not in issue.

It is next objected that the jury was told that, if defendant failed in the duties mentioned, plaintiff might recover, unless his neglect contributed to his injuries, without any saving clause shielding defendant in event of the negligence of a fellow servant. A sufficient answer is (1) that there was not the slightest evidence of neglect of a fellow servant and (2) that the jury was elsewhere repeatedly instructed that the injury must be found to have been in consequence of the negligent construction of the scaffold.

5. TRIAL: instructions: applicability to evidence: unsupported theory.

Again, it is said that recovery is authorized by this instruction without finding the fall or injury to have been

the proximate result of defective construction of the scaffold.

This exaction might well have been included

**6. TRIAL: instructions: construction as a whole: proximate cause.**
in the instruction; but the jury was told in the 1st instruction that such a finding was essential to recovery and without it a verdict should be returned for defendant, and the same in the 3d and 6th instructions, the jury, besides, being cautioned in the 9th instruction that, if the fall and injury were not caused by the defective construction of the scaffold, there should be no recovery. The instructions are to be read and construed together and applied to the evidence as a whole, as advised by the court, and when this is done, there is no room to say that they did not exact a finding that the fall was the proximate result of the defective scaffold, in order to warrant a verdict for plaintiff.

IV. Exception is taken to the 10th instruction because it allowed the jury to take into account future suffering and loss in earning capacity if it were found that plaintiff would

**7. DAMAGES: future pain and suffering: evidence: life tables.**
suffer in the future or be impaired in earning capacity. The evidence of both plaintiff and his mother was to the effect that his ankle had not been previously injured, and Dr. Schooler, a surgeon of long experience, was of opinion that the injury was permanent and that he would always be lame and suffer pain. Even though there was evidence to the contrary, this warranted the instruction and the receipt of the life tables in evidence.

It is argued, however, that, as the other physician attended plaintiff, his testimony is the more credible. Possibly that rule might obtain as to a physical fact, had School-

**8. EVIDENCE: opinion evidence: relative credibility of conflicting experts.**
er's testimony been based on hypothetical questions only,—a point not necessary to decide. But Schooler was shown skiagraphs showing the exact condition of plaintiff's ankle and made a personal examination of it.

In other words, he had as much opportunity for information

as the other physician, and it was for the jury to say whose opinion it would accept. The fault found with Instructions 1, 2 and 8, is hypercritical and requires no consideration. The contention that the evidence is insufficient to sustain the verdict has been disposed of.

Instructions requested, in so far as correct, are included in those given. It is contended that the judgment is excessive. If the evidence most favorable to plaintiff be taken as true, as it must be, we are not at liberty to so find.

**9. APPEAL AND ER-ROR: review: questions of fact: "most favorable view" rule.** Appellee has insisted at every point that the cause ought to be considered because of disregard in the preparation of briefs. Owing to the importance of the case, we have passed on the points raised; but we suggest that the rules adopted for the preparation of briefs are the product of long experience, and counsel will serve their clients best, as they certainly will the court, by following them, to the end that points made may be clearly and separately stated and fully understood.—*Affirmed.*

EVANS, C. J., GAYNOR and SALINGER, JJ., concur.